1
2
3                   IN THE UNITED STATES DISTRICT COURT
4                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
5
6
7   ALFREDO PANGILINAN,                      C 12-0194 TEH (PR)
8              Petitioner,
                                    ORDER DENYING PETITION FOR WRIT
9          v.                       OF HABEAS CORPUS; DENYING
                                    CERTIFICATE OF APPEALABILITY
10  GREG LEWIS, Warden,
11             Respondent.
                               /
12
13        Petitioner Alfredo Pangilinan, a state prisoner
14  incarcerated at Pelican Bay State Prison, located in Crescent City,
15  California, filed this pro se action seeking a writ of habeas corpus
16  under 28 U.S.C. § 2254.  The matter is now before the Court for
17  consideration of the merits of the habeas petition.  For the reasons
18  discussed below, the petition will be denied.
19                                 I
20        On December 17, 2008, a Contra Costa County jury found
21  Petitioner guilty of two counts of first degree murder and assault
22  with a deadly weapon and found true allegations of multiple murder
23  special circumstance and personal use of a deadly weapon.  4 Clerk's
24  Transcript (CT) 810-812.  Petitioner was sentenced to life without
25  possibility of parole plus five years.  4 CT 901.
26        Petitioner appealed his conviction in the California Court
27
28                                 1

of Appeal.  4 CT 931.  On August 10, 2010, the California Court of Appeal filed an unpublished opinion affirming the judgment.  <u>People v. Pangilinan</u>, 2010 WL 3123138 (Cal. Ct. App. Aug. 10, 2010).  On October 20, 2010, the California Supreme Court denied Petitioner's petition for review.  Respondent's Exhibit 8.

On January 12, 2012, Petitioner filed the instant federal petition raising the claim that there was insufficient evidence to support his conviction for the first degree murder of Virginia Farley.  On April 27, 2012, this Court ordered Respondent to show cause as to why the petition should not be granted.  Respondent filed an answer; Petitioner has not filed a traverse.

II

The following factual background is taken from the order of the California Court of Appeal.

> In April 2006, Ronald and Maria Kagayutan owned the Green Harmony Residential Care Home (Green Harmony).  At that time Green Harmony had two residents, Lucy Mogannam, who was over 90 years old, and Ginney Farley, who was in her 60's.  Mogannam was healthy and alert and used a walker to aid her mobility.  Farley was developmentally disabled, diabetic and legally blind; she used a walker and wheelchair. . . .
>
> In about November 2005, appellant applied for a job at Green Harmony but was not hired.  Thereafter, when Maria Kagayutan saw appellant in the backyard of Green Harmony, she told Tumang and Cecilia [the Kagayutans' employees,] that he was not an employee and they should not let him in.  After Cecilia stopped working at Green Harmony, appellant no longer came there, but he would call Tumang at Green Harmony or on her cell phone.
>
> On April 4, 2006, appellant called Tumang and said he was at the back of Green Harmony.  Tumang told him not to come.  When appellant gestured that he needed to use the bathroom, she let him in through a sliding door in the master bedroom.  Appellant asked Tumang for money and she said she did not have any.  In response, he pushed her multiple times, shoving her into the master bedroom bathroom.  He then grabbed a towel bar and began striking her with it until she bled. Appellant also hit Tumang with his fists, kicked her, grabbed her hair and banged her

2

head into the wall.  While hitting her he threatened to "kill all of you."

When Farley began knocking on the master bedroom door saying she was hungry, appellant stopped hitting Tumang, who then ran out of the bedroom.  Appellant hid in the master bedroom closet.  Thereafter, while Tumang was feeding Farley and Mogannam in the kitchen, appellant called Tumang on her cell phone and the Green Harmony phone and told her to come back to the master bedroom because he wanted to tell her something.  Appellant threatened Tumang: "'If you don't come in here, I'm going to be the one to come out.'"  He also threatened to kill her and her children.

Tumang called the Kagayutans, but was unable to reach them.  Tumang left a message for Maria Kagayutan stating that appellant was at Green Harmony and had struck her; she then took the bus home.  While she was on the bus, appellant called her and asked where she was.  Tumang told him she was not at Green Harmony and that he should leave.  He again threatened to kill her and her children.  Maria Kagayutan then called Tumang, who said appellant had struck her.

Maria Kagayutan contacted Ronald Kagayutan and told him to go to Green Harmony because someone was there.  Ronald Kagayutan drove to Green Harmony.  When no one answered the doorbell, he used his key and entered.  Inside, he heard a male voice talking in the bathroom; it sounded "like an argument."  When Ronald Kagayutan got close to the kitchen, he saw Mogannam lying on the floor and a man, later identified as appellant, standing close to her, holding a knife.  A lot of blood was on the floor.  Ronald Kagayutan ran to a nearby house and called 911.  He then saw appellant, holding a small black bag, leave Green Harmony through a side yard.

Police arrived and Mogannam was pronounced dead at the scene.  Farley was found lying in the bathroom with knife wounds to her neck and chest.  She was in severe distress and "quite frightened."  She repeatedly yelled, "Please stop hurting me, please stop hurting me."  The bathroom door was broken down and "in pieces."  Farley told responders she had hid in the bathroom because a "stranger" was in the house and she was afraid.  Farley died three days after the attack.

About 15 minutes after receiving the 911 call, police found appellant walking unsteadily.  He smelled of alcohol.  While the officers struggled to detain him, appellant dropped a blood-stained knife.  His pants were blood-stained.  Ronald Kagayutan identified appellant as the person he saw flee from Green Harmony.

Forensic pathologist Arnold Josselson performed the autopsies on Mognannam and Farley. . . . The autopsy of Farley revealed

3

bruising of her back, thighs, forearm and chin.  There were superficial stab wounds to the right side of her neck and right clavicle with surrounding bruising.  The clavicle wound did not enter the chest and the neck wound did not sever any large blood vessels.  Farley had an endotracheal tube down her throat.  Josselson opined that the large bruising in the area of the stab wounds was the result of bleeding from the stab wounds or some blunt force injury.  Farley's internal systems were essentially normal and the drug levels in her blood were consistent with therapeutic use . . .

[Josselson] opined that none of [Farley's] preexisting medical conditions appeared to cause her death.  He said that sudden causes of death can occur, but that Farley's autopsy showed no signs of a drug overdose, anaphylactic shock, stroke or heart attack. . . .

Pittsburg Police Inspector Conaty talked with Josselson during Farley's autopsy.  Based on the gross autopsy findings, Josselson was unable to give Conaty a cause of Farley's death.  Subsequently, after informing Josselson that Farley was subjected to a violent struggle and attack in a small confined space, Josselson told Conaty it was a "possibility" that the attack was a substantial factor in causing her death.

The following testimony is from Petitioner's trial, where the prosecution questioned Laura Mosqueda, the prosecution's expert on geriatrics, elder dependent abuse and aging with a disability.

Q:   Is there a reasonable probability that the attack on Ms. Farley contributed to her death?

A:   Yes, I think there is.

Q:   Why is that?

A:   In the autopsy report they are unable to list a cause of death.  She didn't have a sudden heart attack, she didn't have a stroke.  She didn't have a blood clot to her lung that would cause sudden death.  There was no reason to think prior to this attack that she was ready to die.  She had been hospitalized a couple of times and recovered back to baseline and seem[ingly] was doing well.  And I just think it's a remarkable coincidence to say that she undergoes a savage attack, undergoes this incredibly – it's a brutal attack and she's clearly very, very frightened following that, unable to understand what's happening, unable to process it and then suddenly dies.  In my mind, those things are linked.

4 RT (Reporter's Transcript) 820.

4

1          On cross-examination, Dr. Mosqueda testified further.

2   Q:   You are just saying it's a reasonable possibility
         that the attack may have contributed to her death?

3
    A:   Reasonable possibility it contributed, yes.
4
    4 RT 824.
5
6          At trial, the prosecution asked Dr. Josselson:

    Q:   Based on your examination of Ms. Farley, were you
7        able to determine her cause of death from what her
         body was telling you?
8
    A:   No, I was not. I was not able to determine the
9        cause of death from the autopsy findings.

10  4 RT 883.

11         When the prosecution gave Dr. Josselson a detailed

12  hypothetical based on Virginia Farley's health condition, Dr.

13  Josselson responded:

14         Well, I would say my opinion is the most likely cause [of
           death] would be a cardiac arrhythmia or abnormal heart
15         rhythm due to stress.  The stress of the assault and also
           if anyone's been a patient in a hospital is a very
16         stressful environment.  So I would say the most likely
           thing would be the assault started a strain[sic] of events
17         that eventually led her to have a cardiac arrhythmia and
           die.
18
    4 RT 887.
19
20         On cross-examination Josselson reiterated that stress

    from the assault was the "most likely" cause of Farley's death.   4
21
    RT 894.
22
                                III
23
24         Under the Antiterrorism and Effective Death Penalty Act of

    1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may
25
    not grant a writ of habeas corpus on any claim adjudicated on the
26
    merits in state court unless the adjudication:  "(1) resulted in a
27
28                              5

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable."  Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003) (internal quotation marks and citation omitted).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly

1  deferential standard for evaluating state-court rulings' and

2  'demands that state-court decisions be given the benefit of the

3  doubt.'"   <u>Felkner v. Jackson</u>, __ U.S. __, 131 S. Ct. 1305, 1307

4  (2011) (citation omitted).

5       When applying these standards, the federal court should

6  review the "last reasoned decision" by the state courts.   <u>Avila v.</u>

7  <u>Galaza</u>, 297 F.3d 911, 918 n.6 (9th Cir. 2002).   This Court looks to

8  the California Court of Appeal's May 18, 2010 written opinion on

9  direct appeal affirming the trial court judgment.

10      With these principles in mind regarding the standard and

11 scope of review on federal habeas, the Court addresses Petitioner's

12 claim.

13                              IV

14                               A

15      Petitioner argues that there was insufficient evidence to

16 support his conviction for the murder of Virginia Farley, arguing

17 that the prosecution failed to prove beyond a reasonable doubt that

18 his assault on Farley was the cause of her death.

19      The Due Process Clause "[p]rotects the accused against

20 conviction except upon proof beyond a reasonable doubt of every fact

21 necessary to constitute the crime with which he is charged."   <u>In re</u>

22 <u>Winship</u>, 397 U.S. 358, 364 (1970).   A state prisoner who alleges

23 that the evidence in support of his state conviction cannot be

24 fairly characterized as sufficient to have led a rational trier of

25 fact to find guilt beyond a reasonable doubt therefore states a

26 constitutional claim which, if proven, entitles him to federal

27 habeas relief.   <u>Jackson v. Virginia</u>, 443 U.S. 307, 321, 324 (1979).

28                              7

The federal court determines "[w]hether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319 (emphasis in original).  The <u>Jackson</u> standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.  <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004).

On habeas review, a federal court evaluating the sufficiency of the evidence under <u>Winship</u> and <u>Jackson</u> should take into consideration all of the evidence presented at trial.  <u>LaMere v. Slaughter</u>, 458 F.3d 878, 882 (9th Cir. 2006).  If confronted by a record that supports conflicting inferences, a federal habeas court "[m]ust presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  <u>Jackson</u>, 443 U.S. at 326.  Credibility determinations by a trier of fact are therefore entitled to near-total deference.  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, <u>Jackson</u> does not permit a federal habeas court to revisit credibility determinations.  <u>Id.</u> at 957-58.

Under 28 U.S.C. § 2254(d), a federal habeas court applies <u>Jackson</u> and <u>Winship</u> with an additional layer of deference.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  A federal habeas court must ask whether the operative state court decision "[r]eflected an 'unreasonable application of' <u>Jackson</u> and <u>Winship</u> to the facts of the case."  <u>Id.</u> at 1275 (citing 28 U.S.C. § 2254(d)(1)

**B**

8

According to California law, in determining whether a defendant's acts were the proximate cause of the death of a human being, the court asks whether the evidence sufficed to permit the jury to conclude that the death was the natural and probable consequence of the defendant's act. <u>People v. Taylor</u>, 119 Cal. App. 4th 628, 639-640 (2004). "[I]n homicide cases, a cause of the [death of the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur." <u>People v. Schmies</u>, 44 Cal. App. 4th 38, 48, 51 (1996). "[A] defendant whose infliction of physical injury upon another is a cause of that person's death is guilty of unlawful homicide even if the injury was not the only cause of death, and even if the victim was in a weakened state due to a preexisting condition." <u>Taylor</u>, at p. 641.

C

Petitioner argues that the prosecutor did not establish beyond a reasonable doubt that his assault on Farley was the cause of her death because the most that either of the prosecutor's experts could say was that the assault on Farley was a possible cause of her death. Petitioner contends that "a medical 'possibility' or even a 'reasonable possibility' fails to meet even the standard required to establish liability in a civil personal injury suit, where the standard of proof is a preponderance of the evidence, much less the standard of proof beyond a reasonable doubt." Petition for Review in the Supreme Court of California, 15.

Although the prosecutor's witnesses did not definitively

testify that Farley's death was caused by Petitioner's acts, Dr. Mosqueda testified that Petitioner's attack was linked to Farley's death, and Dr. Josselson told Police Inspector Conaty that it was a "possibility" that Petitioner's attack was a substantial factor in causing her death.  Dr. Josselson also testified that the most likely cause of death was cardiac arrhythmia due to stress, most likely caused by Petitioner's assault.  <u>Jackson</u> requires the reviewing court to presume that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution.  After viewing the evidence in the light most favorable to the prosecution, it cannot be said that no rational trier of fact could have found that Petitioner caused the death of Virginia Farley.

        The state court denied Petitioner's claim, finding that there was sufficient evidence in the record for a rational trier of fact to conclude that Petitioner  was guilty of murdering Farley. The California Court of Appeal stated:

> Appellant presented no evidence contradicting the opinions of Josselson and Mosqueda that the attack caused Farley to experience extreme stress which resulted in cardiac arrhythmia and ultimately Farley's death.  The testimony of Josselson and Mosqueda provides substantial evidence that despite Farley's preexisting conditions and medications, [Petitioner]'s vicious attack on her set in motion a chain of events that produced her death as a direct, natural and probable consequence of that attack, and without that attack her death would not have occurred.

<u>Pangilinan</u>, 2010 WL 3123138 at *5.

        The California Court of Appeal's rejection of Petitioner's insufficiency of evidence claim was not contrary to, or an unreasonable application of, clearly established federal law as set

10

forth by the Supreme Court nor was it based on an unreasonable
determination of the facts in light of the evidence presented in the
state court proceeding.  Petitioner is not entitled to habeas
relief.

VI

For the foregoing reasons, the petition for a writ of
habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  <u>See</u>
Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner
has not made "a substantial showing of the denial of a
constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner
demonstrated that "reasonable jurists would find the district
court's assessment of the constitutional claims debatable or wrong."
<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not
appeal the denial of a Certificate of Appealability in this Court
but may seek a certificate from the Court of Appeals under Rule 22
of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the
Rules Governing Section 2254 Cases.

The Clerk is directed to enter Judgment in favor of
Respondent and against Petitioner, terminate any pending motions as
moot and close the file.

IT IS SO ORDERED.

DATED      <u>11/08/2012</u>

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.12\Pangilinan 12-0194 HC.wpd

11